UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES TINORY,                          )
                                       )
            Plaintiff,                 )   CIVIL ACTION NO.
                                       )   13-11477-DPW
                                       )
      v.                               )
                                       )
AUTOZONERS, LLC and                    )
ILYA AKSMAN,                           )
                                       )
            Defendants.                )

MEMORANDUM AND ORDER
January 26, 2016

     James Tinory filed this suit against his former employer,
AutoZoners, LLC ("AutoZone"), and his supervisor, Ilya Aksman,
alleging that while himself employed as a supervisor at
Brockton's AutoZone store he was the victim of discrimination
and harassment based upon his perceived sexual orientation.
Specifically, Tinory asserts that AutoZone and its employees,
including Mr. Aksman, violated Massachusetts General Laws Ch.
151B(4)(1) and Title VII of the Civil Rights Act of 1964.
Tinory and the Defendants have filed cross-motions for summary
judgment on these claims.

**I. BACKGROUND**

*A.  Factual Background*

     AutoZone is a car part retailer and distributor based in
Memphis, TN, with offices and facilities based in Massachusetts.

1

James Tinory is a resident of Massachusetts who worked at an Autozone store located in Brockton from August 8, 2011 until July 27, 2012 as a store manager.  Ilya Aksman is a district manager for Autozoners who had supervisory authority over the store of which Tinory was the manager.

As Store Manager, Tinory supervised approximately twenty-five employees and performed critical tasks, such as hiring and terminating staff, keeping track of inventories and stock, and handling cash.  Although some subordinates held the title of "manager," Tinory was the only store employee at his location authorized to hire and fire other workers and set schedules.  He reported directly to Mr. Aksman, the District Manager, who would visit the store once every two weeks to observe its operations and suggest areas for improvement.

There are three incidents to which Tinory points as evidence of harassment and discrimination suffered while at AutoZone.

### 1.   First Incident

The first incident occurred on July 2, 2012, when Tinory had a conversation with Luis Marrero, an AutoZone employee over whom Tinory had supervisory authority, during which he told Marerro that he had taken his teenage son to New York City to visit the Empire State Building.  Tinory complained to Marrero that he had received a parking ticket because of parking issues

created by the Gay Pride parade in Manhattan.  Upon hearing
this, William Torres, a Commercial Sales Manager (who was also a
subordinate of Tinory's), laughed, and said that he "saw
[Tinory] in New York City at the Gay Pride parade" wearing a
pink shirt.  Mr. Torres then claimed that he saw Tinory walking
"like this", putting his hand on his hip, and mimicking a
stereotypically gay manner of walking.  He then walked away,
saying "(all) [sic] I know is that I'm all man."  Mr. Torres
denies that aspect of the encounter and maintains that Mr.
Tinory laughed before agreeing that he had worn a pink shirt at
the parade.

       That same day, Tinory alleges that he spoke with co-
defendant Aksman to tell him that Torres had been mocking him
for his perceived sexual orientation, and that he was "sick of
it."  Tinory asked Aksman to intercede on his behalf, and to
speak with Torres about the matter.  In response, Tinory claims
that Aksman told him to talk to Torres himself, even after
Tinory noted that he would be uncomfortable doing so.  For his
part, Aksman claims that he and Tinory never discussed such
discrimination.

    2.   Second Incident

    The second incident on which Tinory bases his claim
involves a child's bracelet.  On or about July 16, 2012, Tinory
found a small child's bracelet hung up behind the store counter

3

with a note that said, "James's bracelet, don't touch please."
Although all of the other employees referred to Tinory as
"Jimmy," Tinory was the only "James" employed at the store.
Tinory asked the other employees about the bracelet.  They all
denied any knowledge, and other employees, when asked in an
internal AutoZone investigation, contended that the bracelet had
been left behind by a customer.  Believing the bracelet to be an
example of his coworkers intimating that he was homosexual,
Tinory declared that he would keep it "for evidence."  Jose
Colon, an AutoZone employee, then protested that Tinory could
not prove that the bracelet was for him because the attached
note did not contain his last name.  Shortly thereafter, the
store phone rang, and Marrero informed Tinory that the call was
for him.  When Tinory picked up the phone, the caller hung up.
About two minutes later, the phone rang again, and the caller
asked Tinory, "Did you find my bracelet?"

Aksman was visiting the store that day, but Tinory did not
inform him of the bracelet or the phone calls.  Instead, he told
Aksman that he was not feeling well.  Aksman encouraged Mr.
Tinory to see a doctor, and Tinory was permitted to take a few
days off in order to attend to his medical problems.

3.   Third Incident

Two days later, the third incident occurred.  On July 18,
2012, Tinory was in the back of the store with Marrero and

4

Nathaniel Steele.  Tinory heard Marrero exclaim to Mr. Steele, "You're gay! You're gay, Nate!"  According to Tinory, Marrero was looking directly at him as he spoke, as if the comments were directed at him.  Tinory, feeling uncomfortable, left the room. He did not inform Aksman or any other superior about the incident.  After leaving work that day, Tinory never returned to AutoZone.

### 4.   Tinory's Absence from Work

On July 20, 2012, Tinory visited his primary care physician, Dr. Mallick, to determine the cause of his illness. Dr. Mallick determined that Tinory suffered from a polyp and hemorrhoids.  She wrote Tinory a doctor's note, excusing him from work for four days.

On July 23, 2012, the day before he was due to return to work, Tinory retained an attorney, Brian Hatch.  The following day, Hatch faxed a letter to AutoZone's Human Resources Manager, Nick Haluga, informing him that Tinory had been subject to harassment based upon his sexual orientation and that he could "no longer tolerate" the hostile work environment created by his coworkers.  Hatch urged Haluga to contact him as soon as possible to resolve the situation.

On July 25, 2012, one day after Tinory was due back at work, Aksman called him to ask where he was and why he had not returned to the Store.  Rather than answering Aksman's phone

call, Tinory asked Hatch to fax a second letter to Haluga,
repeating that he could no longer tolerate his work environment.

### 5.  Autozone Investigation

After receiving the letters, AutoZone launched an
investigation to determine the veracity of Tinory's claim that he
had been harassed by his coworkers.  As part of the
investigation, AutoZone attempted to interview Tinory himself,
but was refused access by Hatch, his attorney.  Nonetheless,
starting on August 8, 2012, AutoZone interviewed twelve
employees from the Brockton store to learn more about the
employees' treatment of Tinory, as well as Tinory's own
behavior.Upon being interviewed, the AutoZone employees denied
that any harassment had taken place.  Although Mr. Torres
admitted to teasing Tinory about wearing a pink shirt at the gay
pride parade in New York, he claimed that Tinory "laugh[ed]" in
response, before "joking[ly]" conceding that he had indeed worn a
pink shirt.  Several employees also corroborated Tinory's account
of the child's bracelet with the attached note reading, "James's
bracelet, don't touch please," but none took responsibility for
being the note's author.

The interviewees reported that, contrary to Tinory's
assertions, it was Tinory himself who had behaved
inappropriately while managing the store.  Nathaniel Steele, a
customer service employee, stated that Mr. Tinory "would joke

about liking young boys sometimes.  Other times he would joke about being gay."  In addition, Mr. Steele declared that Mr. Tinory "would brag about his supermodel wife or girlfriend, how he would go home and have sex and do drugs."  Mr. Steele clarified, however, that he believed Tinory's boast about drug use to be a joke, rather than the truth, since Tinory "would laugh after he said it."

In his interview with AutoZone HR personnel, Torres echoed Steele's characterization of Tinory, recounting how Tinory would joke about putting objects in his rectum.  Christopher Pendergast, another AutoZone employee, claimed that he had overheard Mr. Tinory discuss inserting an exhaust pipe in his rectum, in addition to discussion of sex with his girlfriend.

Ana Calavantes, a commercial driver at the store, alleged that Tinory's inappropriate behavior extended beyond employees to AutoZone customers.  She described seeing Tinory put an arm around a female customer, causing the woman to make a face expressing her discomfort.  Upon witnessing this incident, other AutoZone employees warned Tinory against touching customers in such a manner.

Aksman reported that employees at Tinory's store had complained to him about Tinory's managerial performance and personal conduct.  Torres informed Aksman that Tinory "wasn't working his schedule and his hours he was obliged to work."

Colon alleged that Tinory had been making unprofessional comments to him on the sales floor, reminding Colon of his managerial power to promote and fire him at any time.  According to Aksman, Tinory himself never complained of any sort of harassment to Aksman, save for an incident with a female employee unrelated to the present suit.  In that matter, Aksman reported to AutoZone's Human Resources Department that the woman was making inappropriate sexual comments about Tinory.  After an investigation into the accuracy of the claims, AutoZone terminated her employment.

Following its investigation of Tinory's most recent claims of sexual harassment, AutoZone concluded that Tinory's allegations of sexual harassment were uncorroborated.  Moreover, based on the information provided by those he supervised, AutoZone determined that Tinory himself had repeatedly engaged in behavior unbefitting of a Store Manager.  In accordance with its findings, AutoZone declared that if Tinory had still been employed as Store Manager at the conclusion of its investigation, it would have fired him.

6.   Autozone Corrective Action

Despite deeming Tinory's harassment claims to be unsubstantiated, AutoZone did issue Corrective Action Review Forms ("CARs") to the following employees: William Torres, Jose Colon, Christopher Pendergast and Luis Marrero.  Marie Saball,

AutoZone's Divisional Human Resources Manager, recommended that Mr. Torres receive a CAR for having a conversation with Tinory "about attending a gay pride parade and for his failure to report [Tinory's] comments about illegal drugs, inserting items into his rectum and other inappropriate jokes."  Colon was issued a CAR for "his failure to report policy violations, which included Mr. Colon failing to report [Tinory's] inappropriate conduct." Likewise, AutoZone gave Pendergast a CAR for "his failure to report [Tinory's] inappropriate conduct in the presence of customers, including making comments about sticking items in his rectum and about having sex with his girlfriend."  Mr. Marrero was also cited with a CAR for "engaging in conduct unbecoming of an AutoZoner due to Mr. Marrero wearing the customer's bracelet he found in the Store instead of placing it somewhere secure until the customer retrieved it."

## II. STANDARD OF REVIEW

A court may grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "The term 'material' means that 'a contested fact has the potential to change the outcome of the suit . . . if the dispute over it is resolved favorably to the nonmovant,' while the term 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the

nonmoving party.'" *Centola* v. *Potter*, 183 F. Supp. 2d 403, 407-08 (D. Mass 2002) (citing *McCarthy* v. *Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

In deciding whether to grant a motion for summary judgment, a court must review the record and draw inferences in favor of the nonmoving party. *Pignons S.A. de Mecanique de Precision* v. *Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir. 1981).  For its part, "the nonmoving party is required to produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue. . . .  [C]onclusory allegations, improbable inferences, and unsupported speculation, are insufficient to establish a genuine dispute of fact.'" *Triangle Trading Co., Inc.* v. *Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (internal citations and quotations omitted).

Where, as here, both parties have moved for summary judgment, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Bienkowski* v. *Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir. 2002) (citing 10A Charles Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720, 335-36 (3d ed. 1998)).

### III. ANALYSIS

**A.   *Federal Title VII Claim***

42 U.S.C. § 2000e-2(a)(1) (also known as Title VII) reads, in pertinent part, "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The language of the statute makes it clear that "Title VII does not proscribe harassment simply because of sexual orientation." *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999). Rather, the plaintiff must show that the discrimination is based upon other prohibited characteristics, such as race or sex. *Centola*, 183 F. Supp. 2d at 408 (citing *Higgins*, 194 F.3d at 259).

The Supreme Court adopted a sex discrimination theory for a same-sex harassment claim under Title VII in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998). The Court found that "nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant . . . are of the same sex." *Id.* at 79. It thus rejected a categorical rule excluding same-sex harassment claims under Title VII. *Id.* But the Court limited its application. The Court directed that, to qualify as same-

11

sex harassment, a claim must meet two requirements.  First, a
plaintiff "must always prove that the conduct at issue was not
merely tinged with offensive sexual connotations, but actually
constituted discrimination because of . . . sex."  *Id.* at 81
(quotation marks omitted).  Second, the conduct must be "severe
or pervasive enough to create an objectively hostile or abusive
work environment—an environment that a reasonable person would
find hostile or abusive."  *Id.* (*citing Harris* v. *Forklift
Systems, Inc.*, 510 U.S. 17, 21 (1993) (*citing Meritor Sav. Bank,
FSB* v. *Vinson*, 477 U.S. 57, 67 (1986))).

Shortly after *Oncale* was handed down, in *Higgins* v. *New
Balance Athletic Shoes*, the First Circuit discussed two
different theories which could define the "because of . . . sex"
requirement in *Oncale*. 194 F. 3d 252, 259-262 (1st. Cir. 1999).
The first theory derived from the Supreme Court's decision in
*Phillips* v. *Martin Marietta Corp.*, 400 U.S. 542, 544 (1971).  In
*Phillips*, the Court held that existence of conflicting family
obligations (e.g. taking care of pre-school-age children), if
proved to be more relevant to job performance for women than for
man, could be a viable basis for a claim under Title VII.
*Phillips*, 400 U.S. at 544.  The plaintiff in *Higgins* borrowed
the *Phillips* rationale.  He argued that he was treated
differently from those female employees even though both
possessed the same quality--sexual attraction to men.  *Higgins*,

12

194 F.3d at 259.   This disparate treatment, he argued showed

that he was discriminated against because of his sex, not merely

because of his sexual orientation.   *Id.*

The plaintiff in *Higgins* also advanced an approach based on

a sex stereotype line of reasoning developed in *Price Waterhouse*

*v. Hopkins*, 490 U.S. 228 (1989).   In *Hopkins*, Justice Brennan

observed that "[a]n employer who objects to aggressiveness in

women but whose positions require this trait places women in an

intolerable and impermissible Catch-22: out of a job if they

behave aggressively and out of a job if they do not."   *Id.* at

251.   He concluded that Title VII forbids employers to

discriminate against individuals simply because they do not

match the stereotypes associated with the group. *Id.*   Relying

upon this rationale, the plaintiff in *Higgins* argued that he was

harassed because he failed to meet the "stereotyped standards of

masculinity".   *Higgins*, 194 F.3d at 259.   Using this rationale,

he argued that he was discriminated against, and ultimately

fired, because of his sex.   *Id.*

The First Circuit did not reach a determination regarding

the sex stereotype theory of Title VII because of procedural

faults on the part of the plaintiff in raising these arguments

for the first time on appeal.   *Id.* at 260-61.   Rather, it

affirmed the district court's grant of summary judgment to the

defendants based on the interpretation of Title VII presented at

the district court level that relied solely on sexual

orientation discrimination *per se*, without the gender-normative

interpretations advanced later on appeal.

Since *Higgins*, this issue has not been discussed

extensively in the First Circuit.  One case that addressed the

issue, *Centola* v. *Potter*, 183 F. Supp. 2d 403 (D. Mass. 2002),

is instructive.  In *Centola*, the plaintiff was a postal worker

who alleged that, over a period of seven years, his colleagues

continuously mocked him about his masculinity, implied he was a

homosexual, and left mocking photographs in his work-space to

the same effect.

> On one occasion, Centola's co-workers placed a sign
> stating "Heterosexual replacement on Duty" at his case.
> Co-workers taped pictures of Richard Simmons "in pink
> hot pants" to Centola's case. . . .  Fellow carriers
> asked Centola if he would be marching in a gay parade
> and asked him if he had gotten AIDS yet. At other times,
> his co-workers called him a "sword swallower" and anti-
> gay epithets.  His co-workers also placed cartoons
> mocking gay men at his case. Centola testified that this
> harassment was a constant thing.

*Centola* v. *Potter*, 183 F. Supp. 2d 403, 407 (D. Mass. 2002).

Centola also claimed that he faced discriminatory conduct (such

as increased and stricter supervision, and harsher punishment

for minor rule violations) at the hands of his supervisors, not

just from his other co-workers.  Furthermore, when the plaintiff

finally complained about the behavior to his supervisors, the

supervisors fired him.  Essentially, "Co-workers and

supervisors, [Centola] claim[ed], discriminated against him because he failed to meet their gender stereotypes of what a man should look like, or act like.  In doing so, they created an objectively hostile and abusive work environment in violation of Title VII." *Id.* at 409.

Judge Gertner ruled that whether or not Centola's co-workers and supervisors had purposefully discriminated against him or created a hostile environment was a fact question to be decided by the jury.  In analyzing the issue, she distilled her analysis into the following rule: "If an employer acts upon stereotypes about sexual roles in making employment decisions, or allows the use of these stereotypes in the creation of a hostile or abusive work environment, then the employer opens itself to liability under Title VII's prohibition of discrimination on the basis of sex." *Id.*  I find *Centola* to provide an appropriate state of the law in this Circuit with regard to claims under Title VII based harassment or discrimination alleged to stem from sex stereotyping.

The factual record before me does not change significantly when analyzed in light more favorable to one party or the other. The three main events upon which Tinory bases his claims are essentially undisputed.  The motivations behind the mocking of Tinory at the hands of his co-workers may be disputed.  However, there are other uncontested facts (such as his co-workers'

testimony about his encouragement of such jokes, his contribution to a work environment in which such jokes are tolerated, and the fact that his supervisor did not participate in the conduct) found in testimony from Tinory's co-workers and supervisors that dilute the narrative put forward by Tinory.

Tinory worked at AutoZone as a store manager for approximately a year, from August, 2011, to July, 2012. The three events he alleges as the basis for his discrimination claim occurred on July 2, 2012, July 16, 2012 and July 18, 2012. He alleges no earlier events. Multiple co-workers noted that, instead of discouraging joking about sexual orientation, Tinory encouraged such behavior. In fact, some (uncontested) testimony supports the idea that Mr. Tinory himself made jokes about his own sexual orientation and sexual proclivities.

These facts eviscerate the showing that Mr. Tinory was discriminated against or harassed "because of" his sex. First, with regard to the first *Oncale* prong, there is no evidence of actual discrimination. Unlike the situation faced by the plaintiffs in *Higgins* and *Centola*, Tinory was never fired or in any way discriminated against by superiors. The one allegedly discriminatory action on the part of his superior, Aksman, involved Aksman telling Tinory to talk to his subordinates about workplace behavior, a task clearly within his job description as store manager. There is nothing to support the proposition that

16

Aksman participated in the joking about Tinory's sexuality, nor is there a claim that Aksman retaliated against Tinory in any way as the result of his raising the issue to Aksman.  Aksman responded in a reasonable way for a manager hearing about workplace issues for the first time from another manager: he told Tinory to discuss the issue with the people over whom he had direct supervisory authority.

The second prong of *Oncale* is likewise unsatisfied. Although a reasonable person *might* find some of the jokes "severe" in nature, there is nothing to indicate that the mocking of Tinory was "pervasive" enough to create an environment that a reasonable person would find abusive or hostile.  In *Centola* and *Higgins*, the plaintiffs faced groups of their colleagues, including some supervisors, ganging up on them to mock them for their sexuality (sometimes in the form of the gender shaming recognized by Title VII) and taking actions against them for complaining about it.  That is precisely the kind of situation Title VII is supposed to remedy: a hostile and abusive workplace where some of one's tormentors are the very people to whom one would normally report such abuse.  The plaintiffs in *Centola* and *Higgins* endured those environments for a number of years.  The instances of bullying, mockery and shaming were not isolated incidents; they formed precisely the kind of sustained and pervasive patterns of harassment that the

17

Supreme Court recognized as indicative of an objectively hostile environment.

Tinory's own participation in, and encouragement of, a crude and insensitive environment belies the notion that he himself found it abusive or hostile.  A reasonable person in his position would not have found it to be so.  If Tinory actually took offense regarding the events he alleges, three instances of mocking by subordinates in almost a year of employment does not rise to the level of pervasiveness required to create an objectively hostile or abusive environment.  As coarse and childish as the instances of mockery and joking may have been, they do not rise to the level of concerted, continuous, and malicious gender-normative mockery required to form a viable Title VII claim based on sex.  The alleged sporadic use of homophobic epithets at AutoZone seems less maliciously and discriminatorily directed at Tinory than a modest number of puerile off-hand default slurs.  The conduct was offensive and perhaps worthy of the in-house discipline handed down to the employees by AutoZone itself.  However, it did not rise to the level of a regular, malicious pattern of mockery and discrimination that creates an abusive workplace and affects the terms and conditions of the victim's employment.

**B.   *Massachusetts Claims***

Unlike Title VII, Massachusetts law does explicitly recognize discrimination based on sexual orientation in its anti-discrimination law.  Massachusetts General Laws Chapter 151B § 4(1) states that it is unlawful

> [f]or an employer, by himself or his agent, because of the . . . sexual orientation . . . of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

Mass. Gen. Laws Ch. 151B, §4(1) (West 2015).  However, even though sexual orientation discrimination is covered under the statute, there still remains a high bar for a plaintiff alleging such discrimination to show that such discrimination is extensive and pervasive enough to be covered under the statute.

Chapter 151B discrimination "'encompasses a work environment pervaded by abuse and harassment' and applies to the 'terms, conditions and privileges of employment.'"  *Messina* v. *Araserve, Inc.*, 906 F. Supp. 34, 36 (D. Mass. 1995) (quoting *College-Town, Div. of Interco, Inc.* v. *Mass. Com'n Against Discrimination*, 400 Mass. 156, 162, 508 N.E.2d 587, 591 (1987)).  The discrimination or harassment alleged "must show that the employer's conduct was intentionally or in effect hostile, intimidating, or humiliating to the plaintiff in a way which affected [his] performance or the conditions of [his]

19

employment." *Ramsdell* v. *Western Massachusetts Bus Lines, Inc.*, 415 Mass. 673, 678-79, 615 N.E.2d 192, 196 (1993). In analyzing the behavior, a court "must consider the conduct both objectively and subjectively. That is, 'the court must determine whether, in the totality of the circumstances, the alleged [conduct] would interfere with [a] hypothetical reasonable individual's work performance and affect seriously the psychological well-being of a reasonable person. . . ." *Daigle* v. *NECX, Inc.*, 13 Mass. L. Rptr. 462, 2001 WL 1199868 (Mass. Sup. Ct. 2001) (quoting *Lewis* v. *Gillette Company*, 1993 WL 291771, at *6 (D. Mass. 1993) (citations omitted)).

Massachusetts case law largely focuses on the conduct of the employer or one of its agents, such as a manager or supervisor. Under Massachusetts law, such direct discrimination (actionable regardless of whether or not the ultimate employer, i.e. the company, was aware of it) under the statute can only be perpetrated by someone in a supervisory position who implicitly has the power to act for the employer. *See College-Town,* 400 Mass. at 165. The statute does, however, impose a requirement upon employers that are aware of discriminatory behavior perpetrated by any of its employees, not just managers. If an employer is notified of discriminatory behavior perpetrated by a co-worker (subject to the same analysis as if it had been perpetrated by a supervisor), the company has an "affirmative

obligation to remedy the situation." *Id.* at 167.  If the behavior rises to the level required by the statute (i.e. affects the terms and conditions of the employee's employment), and an employer with knowledge does not take steps to remedy the situation, the employer is liable just as if the employer or an agent of the employer had engaged in such conduct.

The first aspect of this case that bears repeating is that neither AutoZone itself nor Aksman harassed or discriminated against Tinory under the meaning of either Title VII or the Massachusetts law.  The only allegation of direct involvement by the employer (AutoZone) or its agent (Aksman) is Aksman's meeting with Tinory, where he told Tinory to use his own supervisory position to talk to his co-workers about the problem.  And, as discussed above, this sole act does not rise to the level of discrimination that would affect the employment of a reasonable person under the meaning of the statute.

In order for AutoZone or Aksman to be liable for the discrimination and harassment alleged here, Tinory must show that his co-workers engaged in conduct prohibited by the Massachusetts law, that AutoZone or Aksman was aware of it, and that AutoZone and Aksman failed to take remedial measures in response.  Again, even assuming that all material facts are as Tinory alleges them, under Massachusetts law, just as under Title VII, Tinory's case fails.  As discussed above, the

harassment alleged does not rise to the level of a pattern of
pervasive abuse required to form the basis for such a claim.  It
also did not affect the terms and conditions of his employment,
or his quality of work.

The handful of incidents all falling within a period that
comprises a fraction of the total time Tinory worked for
AutoZone does not constitute a pervasive pattern.  Similarly,
the alleged harassment would not have affected a reasonable
person's ability to work.  To the extent his ability to work
suffered in July of 2012, it seems to have been the result of
his own issues outside of the workplace.  Apparently, health
issues prevented Tinory from working for a period of time.
However, AutoZone was accommodating regarding such issues.

Tinory contends that the alleged harassment may have
contributed to the health problems that affected his work.  He
appears to suggest his subjective perception of the joking at
work may have affected him so strongly as to make him ill. But
the standard under the Chapter 151B calls for the behavior to be
analyzed both subjectively and objectively.  And his reaction
was not an *objectively* reasonable reaction to three instances of
the kind of joking he himself often took part in at work.

Tinory's case under Massachusetts law fails because the
conduct he describes does not rise to the level required to form
a cognizable claim.  However, even had he alleged sufficient

harassment to form such a claim, he would also have to show that AutoZone was aware of the issue and took no remedial action. Aksman may have been aware of an issue, but his response to Tinory's alleged conversation with him was reasonable because Tinory himself had the authority to remedy the situation. Furthermore, the incident regarding which Tinory told Aksman was singular and could not constitute anything close to the pattern of pervasive and continuous conduct required to form a claim of workplace harassment.  Plainly, Aksman was not required on that basis to take any other remedial measures than to suggest that Tinory exercise his own managerial responsibility and prerogatives.

When AutoZone and Aksman did become aware of the broader pattern of discrimination (only after Tinory absented himself from work and directed communications through his attorney), they took remedial measures as required by the statute. AutoZone's HR department undertook an investigation, and issued reprimands in the forms of Corrective Actions Review Forms to multiple employees at Tinory's location.  Thus, even if Tinory's allegations could be said to form the basis for a viable claim under the Massachusetts law, the subsequent remedial measures taken by AutoZone upon learning of such behavior were reasonable and sufficient.  This is true particularly in light of the fact that Tinory no longer worked at the location, making many

possible alternative remedial measures (such as counseling or transfer of location) impossible for AutoZone.

Because the conduct alleged was not objectively pervasively abusive enough to affect the terms and conditions of Tinory's employment, Tinory's claim fails under M.G.L. Ch. 151B.

### IV. CONCLUSION

For the foregoing reasons, I GRANT the defendants' motion for summary judgment as to all Claims for Relief, DENY the plaintiff's motion for summary judgment and direct the clerk to enter judgment for the defendants.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE